UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| YECHIEL BROMBERG, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | Civil Action No. 4:18-cv-4284 |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMAND |
| v. | § | |
| | § | |
| ROWAN COMPANIES PLC, WILLIAM E. ALBRECHT, THOMAS P. BURKE, THOMAS R. HIX, JACK B. MOORE, SUZANNE P. NIMOCKS, THIERRY PILENKO, JOHN J. QUICKE, TORE I. SANDVOLD, and CHARLES L. SZEWS, | § § § § § § § § | |
| | § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for his complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action stems from a proposed transaction announced on October 7, 2018 (the "Proposed Transaction"), pursuant to which Rowan Companies plc ("Rowan" or the "Company") will combine with Ensco plc ("Ensco") in an all-stock transaction.

2.     On October 7, 2018, Rowan's Board of Directors (the "Rowan Board" or the "Board")) caused the Company to enter into a Transaction Agreement (the "Agreement") by and between Ensco and Rowan.

3.     Pursuant to the terms of the Agreement, if the Proposed Transaction is approved by Rowan's shareholders and completed, eligible Rowan shareholders will be entitled to receive

2.215 Class A ordinary shares, nominal value $0.10 per share, of Ensco (the "Ensco ordinary shares") for each Class A ordinary share, nominal value of $0.125 per share, of Rowan (the "Rowan ordinary shares") owned by such Rowan shareholders and subject to the Scheme of Arrangement.  Following the completion of the transaction, it is anticipated that persons who were shareholders of Ensco and Rowan immediately prior to the transaction will own approximately 61% and 39% of the combined company, respectively.

4.     Rowan's shareholders are being asked to vote on the Proposed Transaction at a Court Meeting (the "Court Meeting") and at a general meeting of shareholders (the "Rowan general meeting").

5.     On October 30, 2018, Defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

6.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement materially false and misleading.  Accordingly, Plaintiff alleges herein that Defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

8.     This Court has jurisdiction over Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District or is an

individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company has offices District; and (ii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Rowan ordinary shares.

11.     Defendant Rowan, incorporated in England and Wales, is a global provider of offshore contract drilling services to the oil and gas industry in the ultra-deepwater and shallow water market, with a focus on high-specification and harsh-environment jack-up rigs and ultra-deepwater drillships.  Rowan's registered office and principal executive offices are located at 2800 Post Oak Boulevard, Suite 5450, Houston, Texas, 77056.  Rowan's ordinary shares are traded on the New York Stock Exchange ("NYSE") under the symbol "RDC".

12.     Defendant William E. Albrecht ("Albrecht") was a director of Rowan, and Chairman of the Rowan Board, at all times relevant hereto.

13.     Defendant Thomas P. Burke ("Burke") was a director of Rowan, and its Chief Executive Officer ("CEO"), at all times relevant hereto.

14.     Defendant Thomas R. Hix ("Hix") was a director of Rowan at all times relevant hereto.

15.     Defendant Jack B. Moore ("Moore") was a director of Rowan at all times relevant hereto.

16.     Defendant Suzanne P. Nimocks ("Nimocks") was a director of Rowan at all times relevant hereto.

17.     Defendant Thierry Pilenko ("Pilenko") was a director of Rowan at all times relevant hereto.

18.     Defendant John J. Quicke ("Quicke") was a director of Rowan at all times relevant hereto.

19.     Defendant Tore I. Sandvold ("Sandvold") was a director of Rowan at all times relevant hereto.

20.     Defendant Charles L. Szews ("Szews") was a director of Rowan at all times relevant hereto.

21.     Defendants identified in paragraphs 12 through 20 are collectively referred to herein as the "Individual Defendants," and together with Rowan are referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action on behalf of himself and the other public owners of ordinary shares of Rowan (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable.  As of July 26, 2018, there 27,053,984 Rowan ordinary shares, and an additional 1,148,701 Rowan ordinary shares held by an affiliated employee benefit trust.  Those ordinary shares are held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25.    Questions of law and fact are common to the Class, including, among others, whether Defendants violated the 1934 Act and whether Defendants will irreparably harm Plaintiff and the other members of the Class if Defendants' conduct complained of herein continues.

26.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company, Its Strong Financial Outlook, and the Proposed Transaction**

29.    Rowan is a global provider of offshore contract drilling services to the oil and gas industry in the ultra-deepwater and shallow water market, with a focus on high-specification and harsh-environment jack-up rigs and ultra-deepwater drillships.  Rowan operates in three segments: Deepwater, Jack-ups and Saudi Aramco Rowan Offshore Drilling Company ("ARO"),

Rowan's 50/50 joint venture with Saudi Aramco Development Company ("Saudi Aramco"). The Deepwater segment includes four ultra-deepwater drillships.

30.     The Jack-ups segment is currently composed of 21 self-elevating jack-up rigs and includes the impact of the various arrangements with ARO.

31.     ARO owns a fleet of seven self-elevating jack-up rigs, including two jack-ups that were sold to ARO by Rowan effective October 1, 2018, for operation in the Arabian Gulf for Saudi Aramco.

32.     For the six months ended June 30, 2018, Rowan's consolidated revenue totaled approximately $452.5 million.  For the year ended December 31, 2017, Rowan had consolidated revenue of approximately $1.3 billion and, as of December 31, 2017, employed approximately 2,800 personnel.

33.     According to the Proxy Statement, the Rowan Board considers and evaluates potential strategic alternatives from time-to-time.  As part of Rowan's continuing assessment of strategic alternatives and efforts, Rowan executive management periodically met with investment banks covering the offshore drilling industry, including Goldman Sachs & Co. LLC ("Goldman Sachs").   In addition, from time-to-time, Rowan received general inquiries or expressed interest regarding strategic transactions involving Rowan or certain of its businesses or assets as well as discussing with potential counterparties the possible acquisition of additional rigs.  The Rowan Board determined that none of these inquiries or resulting discussions was sufficiently compelling to be potentially actionable, other than its formation of an offshore drilling joint venture with the Aramco, the purchase of two recently built jack-ups in Brazil and the Proposed Transaction.

34.     In the fourth quarter of 2014, certain representatives of Aramco entered into discussions with Burke and other Rowan representatives about the possibility of creating a joint venture with the purpose of offshore drilling in the Kingdom of Saudi Arabia and potentially elsewhere.

35.     At the beginning of 2015, Aramco commenced a formal process to select a partner for an offshore drilling company.  In the second phase of this process, which started in the beginning of the second quarter of 2015, Rowan was one of three finalists.  In the third quarter of 2015, after two rounds of management presentations, Aramco selected Rowan as the potential future joint venture partner for offshore drilling.  The Rowan Board concluded that the Rowan executive management team, led by Burke, was instrumental in helping Rowan achieve this result based on their personal effort to engage with Aramco and its strategic goals.

36.     From the second quarter of 2015 to the fourth quarter of 2016, Rowan, represented by Burke and others, and Aramco negotiated the terms of the offshore drilling joint venture.

37.     Between late 2015 and August 2016, Dr. Carl Trowell ("Trowell"), director and President and CEO of Ensco, and Burke held several informal and non-specific conversations exploring whether a combination of the two companies could add value to shareholders.  These conversations did not result in any formal engagement between the parties.

38.     In the first quarter of 2016, Rowan made two proposals to purchase Party A, a global provider of offshore contract drilling services with jack-up rigs and lift-boats. Additionally, in the second and fourth quarters of 2016, Rowan made offers to purchase two harsh environment jack-ups from Party A.  Ultimately, Party A decided to pursue other opportunities for the sale of these assets.

39.     During the summer and fall of 2016, members of the Rowan Board and Rowan executive management engaged in a series of exploratory conversations and meetings with Party B, a global provider of offshore contract drilling services with jack-up and floating rigs, regarding a possible transaction.

40.     Shortly after Rowan had commenced further discussions with Party B, in August 2016, Trowell contacted Burke to discuss Rowan's interest in a possible business combination with Ensco.  Burke and Trowell agreed to further discuss a possible combination.

41.     On October 27, 2016, the Rowan Board conducted a strategic assessment, including assessing the current industry dynamics, Rowan's competitive position and evaluating Rowan's long-range forecast under a variety of scenarios.  At this meeting, the Rowan Board and Rowan executive management discussed the conversation between Trowell and Burke.  The Rowan Board directed executive management to temporarily postpone discussions with Ensco given ongoing negotiations regarding a 50/50 joint venture to own, manage and operate offshore drilling units in Saudi Arabia and potentially elsewhere, which joint venture would ultimately be named ARO, the on-going discussions with Party B and the continuing bid to acquire two harsh environment assets from Party A.

42.     On November 7, 2016, Trowell contacted Burke to ask if Rowan was interested in pursuing a possible business combination.  Burke stated that he would discuss the matter with the Rowan Board.  The Rowan Board later determined that Rowan would continue to explore a combination with Party B based on the perceived benefits of that combination at that time.

43.     On November 21, 2016, Rowan and Aramco, through subsidiaries, entered into a Shareholders' Agreement to create ARO.  Burke committed to support the new venture by taking a seat on the ARO board of directors.

44.    In January 2017, Rowan engaged a financial advisor to review an opportunity to acquire Party C, a global provider of offshore contract drilling services with deep-water rigs.    In that same month, the Rowan Board and executive management reviewed the opportunity with Party C and received the Rowan Board's support to further explore the opportunity.

45.    In the first and second quarters of 2017, following Rowan's and Party B's entry into a confidentiality agreement, Rowan and Party B commenced a series of discussions to determine, among other matters, if a mutually acceptable structure could be achieved.

46.    On February 24, 2017, Burke met in Europe with principals of Party D, a global provider of offshore contract drilling services with harsh environment semisubmersibles.    Rowan evaluated an acquisition of Party D, but executive management was ultimately unable to make a recommendation to the Rowan Board to pursue the transaction.

47.    From January 2017 to March 2017, Party E, a global provider of offshore contract drilling services, and Stephen Butz ("Butz"), the Executive Vice President and Chief Financial Officer ("CFO") of Rowan, had several conversations regarding the potential acquisition of Party E's jack-up fleet.    Rowan's executive management evaluated the opportunity and, on March 9, 2017, received approval from the Rowan Board to make a non-binding offer.    However, after Butz discussed price expectations with Party E, Rowan's executive management decided not to submit a formal bid.

48.    On April 26, 2017, the Rowan Board held a board meeting and Rowan executive management presented the opportunity to acquire Party C.    The Rowan Board and executive management did not find Party C's proposed valuation compelling at that time.    The Rowan Board also reviewed several other potential transactions, including the acquisition of two recently built jack-ups in Brazil and other potential corporate combinations.    The Rowan Board

also reviewed a combination with Party F, a global provider of offshore contract drilling services with jack-ups and floating rigs. While the Rowan Board believed the industrial logic of a combination with Party F was attractive, they decided to not actively pursue the opportunity due to the low level of Party F's contracted backlog and Party F's near-term debt maturities.

49.     During a customer workshop on May 3, 2017, Trowell approached Burke about Ensco's continued interest in a transaction with Rowan. Burke responded that he would discuss a potential combination of Rowan and Ensco with the Rowan Board, which was scheduled to occur in late May 2017.

50.     On May 10, 2017, Rowan was notified that it was the highest bidder at auction of two recently built jack-ups in Brazil.

51.     On May 25, 2017, Burke and Trowell met in London. Trowell noted that Ensco would be interested in a potential combination with Rowan. Burke informed Trowell that Burke believed the Rowan Board would be amenable to further discussions provided the terms of the combination were compelling. However, while Burke had discussed a potential combination with Ensco with Rowan's Chairman, he had yet to discuss it with the Rowan Board, which he was scheduled to do later that day.

52.     Later that day, the Rowan Board, together with executive management, held a telephonic meeting and discussed the potential purchase at auction of the two recently built jack-ups, a potential combination with Party B and a potential combination with Ensco. Rowan executive management recommended that Rowan should focus on pursing a transaction with Party B. If a transaction with Party B was unsuccessful, then Rowan's executive management recommended that Rowan could consider a combination with Ensco or Party G, a global provider of offshore contract drilling services with jack-up and floating rigs. The Rowan Board

agreed with this assessment and instructed executive management to pursue a combination with Party B.

53.     On May 30, 2017, Ensco announced its acquisition of Atwood.

54.     On June 1, 2017, the CEO of Party G and Burke discussed a possible transaction. Rowan and Party G entered into a confidentiality agreement on June 12, 2017, to permit the parties to exchange confidential materials.

55.     On June 8, 2017, Party B informed Rowan that it would start a formal bidding process and provided Rowan with an instruction letter with respect to the process.  Rowan submitted a bid for Party B in July 2017.  From that time through November 2017, Rowan and Party B engaged in extensive discussions regarding the financial and legal terms of a proposed transaction and accompanying governance arrangements.  Over that period, the Rowan Board met multiple times to review the potential combination with Party B.  At its meeting in July, the Rowan Board concurred with Rowan executive management's assessment that pursuing a combination with Party B was preferable to a transaction with Party G (with Ensco now engaged with the Atwood combination).  However, at the end of November 2017, negotiations with Party B were terminated after reaching an impasse.

56.     On October 19, 2017, Rowan announced the commercial start-up of ARO.

57.     On December 10, 2017, the CEO of Party G contacted representatives of Rowan to express Party G's interest in a possible transaction with Rowan. Burke and Party G's CEO agreed to meet after the start of 2018.

58.     The next day, on December 11, 2017, Rowan and Party B agreed to recommence their negotiations that had terminated at the end of November 2017.  From then until mid-February 2018, Rowan and Party B continued discussions regarding a possible transaction.

However, towards the end of February 2018, Rowan and Party B again agreed to terminate discussions given continued disagreements over significant issues.

59.    On January 19, 2018, Rowan executive management met with advisors for Party H, a global provider of offshore contract drilling services with floating rigs that recently emerged from restructuring, to discuss strategic alternatives under review by Party H.  Rowan executive management commenced due diligence to evaluate the industrial and financial merits of a combination with Party H.

60.    On February 5, 2018, a representative of Rowan discussed Party H's price expectations with Party H, after which Rowan executive management determined that further diligence was not warranted.

61.    That same month, Burke and the CEO of Party G met for breakfast to discuss a possible transaction between Rowan and Party G.  Burke and Party G's CEO agreed that each company's respective senior executives should meet to further discuss a possible transaction.

62.    On February 26, 2018, Rowan held a meeting of the Rowan Board to review various strategic alternatives.  The Rowan Board reviewed material about and discussed potential transactions with both Ensco and Party G.  There was a discussion concerning the likelihood that Ensco would pay a meaningful premium for Rowan given Ensco's experience with the shareholder activist campaign with respect to the Atwood acquisition and overall market sentiment in the offshore drilling industry.  The Rowan Board further discussed certain concerns with Party G and potential solutions, none of which seemed commercially satisfactory, but which were nonetheless worthy of additional investigation.  The Rowan Board reviewed the 10-year historical exchange ratio of Rowan common shares compared to both Party G and Ensco's respective equity securities and determined that the then-current exchange ratio was at a multi-

year high-point in favor of Rowan shareholders.   Rowan executive management advised the Rowan Board that, in management's opinion, Ensco's fleet was significantly improved given its acquisition of Atwood, which made a combination with Ensco more attractive than before its merger with Atwood.   The Rowan Board determined to pursue both the Ensco and Party G opportunities contemporaneously and to evaluate each transaction at a further date after additional analysis.

63.    On March 3, 2018, executives of Rowan and their counterparts from Party G met to discuss initial due diligence around the aforementioned concerns.   On March 19, 2018, Rowan and Party G entered into an amendment to the June 12, 2017 confidentiality agreement to allow for the exchange of certain sensitive information through a clean team.   Throughout the month, Rowan and Party G exchanged due diligence materials.

64.    On March 23, 2018, Burke and Trowell met in Houston.   Trowell again queried whether Rowan would be interested in a possible transaction with Ensco.   Trowell proposed a merger transaction structure, with neither party's shareholders receiving a premium.   Burke again reiterated that the Rowan Board was amenable to discussions subject to acceptable terms. However, Burke noted that the Rowan Board would want a premium for Rowan shareholders. Trowell reiterated the merger transaction structure, with neither party's shareholders receiving a premium to market value.   Burke committed to communicate a combination as described by Trowell to the chairman of the Rowan Board, Defendant Albrecht, and the broader Rowan Board.

65.    On March 28, 2018, Rowan held a meeting of the Rowan Board during which the Rowan Board and Rowan executive management discussed both potential transactions with Party G and Ensco.   The Rowan Board determined that concerns around Party G undercut the

strategic rationale of the possible transaction with Party G and the potential benefit to Rowan shareholders.    The Rowan Board instructed Rowan executive management to terminate discussions with Party G.    The Rowan Board then discussed a possible combination with Ensco. Following that discussion, the Rowan Board instructed Rowan executive management to continue discussions with Ensco.

66.    On March 29, 2018, Rowan terminated discussions with Party G regarding a potential transaction.

67.    On April 26, 2018, Ensco and Rowan entered into a mutual confidentiality agreement (the "confidentiality agreement") with mutual standstill provisions.    Following the execution of the confidentiality agreement, Ensco and Rowan began to share confidential information regarding their operations.

68.    On April 27, 2018, Ensco sent a nonbinding proposal to Rowan regarding a potential combination of Ensco and Rowan.    Ensco proposed an all-stock transaction reflecting an at-market, no premium combination, with an exchange ratio determined based on the trailing 30-day average trading price for the Rowan ordinary shares and Ensco ordinary shares preceding the signing.    The indication of interest included Ensco's initial proposal for certain governance matters, including a nine member board of directors, with Ensco designating five directors and Rowan designating four directors.

69.    On April 30, 2018, Trowell again met Burke in Houston to discuss the April 27 framework.    Trowell expressed his strong view that the exchange ratio must reflect an at-market deal.

70.    Throughout May 2018, Rowan and Ensco conducted preliminary due diligence with respect to each other's operations, financial condition and legal matters.

71.     On May 2, 2018, Goldman Sachs delivered an executed disclosure letter regarding certain of its relationships with Ensco to Rowan.  An engagement letter dated June 18, 2018, detailing the terms of Goldman Sachs' engagement was subsequently executed.

72.     On May 7, 2018, the Rowan Board met, during which meeting the Rowan Board and executive management of Rowan and certain of Rowan's financial and legal advisors discussed the proposal sent by Ensco.  The Rowan Board discussed the risks of certain unresolved Ensco contingent liabilities, namely the litigation and regulatory review in connection with a terminated drilling contract in Brazil and certain ongoing governmental investigations with respect to the procurement of such drilling contract (collectively, the "Brazil matter"), and attractiveness of a combination with Ensco versus remaining a standalone company.  The Rowan Board also discussed the implications of asking for and the requirement to obtain a waiver of certain rights that Aramco had with respect to ARO in the event of a change in control of Rowan (the "CIC Rights").  The Rowan Board instructed executive management to continue discussions with Ensco.

73.     On May 9, 2018, Ensco and Rowan executed clean team addendums to the confidentiality agreement, pursuant to which each party would share certain competitively sensitive confidential information only with specified individuals from Ensco and Rowan and their outside financial and legal advisors.  Following execution of the clean team addendums, Ensco and Rowan began to share competitively sensitive confidential information.

74.     On May 17, 2018, representatives of Ensco, including Trowell and Baksht and McGuinty, held a telephonic meeting with representatives of Rowan, including Burke, Butz, Mark F. Mai, Executive Vice President, General Counsel and Secretary of Rowan, and Son Vann, Vice President of Corporate Development of Rowan, to discuss ARO.

75.    On May 18, 2018, Trowell and McGuinty, Baksht and Lowe held a telephonic meeting with Burke and Butz, Mai and Vann to discuss Ensco's business operations, including an overview of its rig fleet.

76.    During a regular quarterly Ensco Board meeting held on May 20 and 21, 2018, Trowell and Lowe, Baksht and McGuinty presented the Rowan opportunity to the Ensco Board as one of several potential strategic options and discussed with the Ensco Board Rowan's fleet quality, potential synergies, geographic footprint, and the unique growth opportunity presented by Rowan's partnership with Aramco through ARO.  Given the attractiveness of a combination with Rowan, the Ensco Board determined that Ensco should continue discussions with Rowan regarding a potential transaction.

77.    On May 23, 2018, Trowell and Burke met in London.  During the meeting, they discussed, among other things, the strategic rationale for a potential business combination between Ensco and Rowan, value creation opportunities, and potential synergies of such a combination.  Trowell reiterated that Rowan's response to Ensco's nonbinding proposal should be a merger at market value.

78.    That same day, Burke met with representatives of Party I, a global provider of offshore contract drilling services with jack-up and floating rigs, to discuss a possible acquisition of certain jack-up assets from Party I.

79.    On May 24, 2018, the Rowan Board met and discussed various strategic alternatives available, including three potential transactions, the possible combination with Ensco and several other opportunities to acquire assets from counterparties in financial distress.  The Rowan Board discussed in depth the possible combination between Rowan and Ensco and a response to Ensco's proposal from April 27, 2018.  Among other things, the Rowan Board

instructed executive management to pursue terms of a possible combination that would result in Rowan's shareholders collectively owning 45% of the combined company pro forma for the transaction and provide for certain governance arrangements in favor of Rowan. The Rowan Board also instructed Rowan executive management to further evaluate potential exposure arising from the Brazil matter. The Rowan Board discussed the CIC Rights and the reasons why Aramco might exercise these rights. Additionally, the Rowan Board discussed whether Rowan must have the right to appoint the initial CEO of the combined company because of the important dynamics involved in Burke's ongoing relationship with Aramco. The Rowan Board concluded that continuity of Burke's leadership between Rowan and the combined company was integral to delivering value from ARO. The Rowan Board instructed Rowan executive management to communicate these terms to Ensco.

80.    On May 29, 2018, Rowan sent Ensco a letter in response to Ensco's April 27th proposal. In this nonbinding proposal, Rowan expressed its interest in continuing discussions regarding a potential transaction and, based on instructions from the Rowan Board, proposed an exchange ratio that would result in Rowan's shareholders collectively owning 45% of the combined company pro forma for the transaction. In addition, Rowan's letter described certain governance matters, including a desire that Rowan's CEO be the CEO of the combined company, that Ensco's CEO or its chairman of the board be the chairman of the board of directors of the combined company, that Ensco and Rowan designate an equal number of directors to the combined company's board and that the committees of the combined company's board have equal representation of legacy Ensco and Rowan directors.

81.    On June 5, 2018, Ensco sent an updated non-binding proposal to Rowan, which proposed that Rowan shareholders receive 2.50 ordinary shares of Ensco for each Rowan

ordinary share as transaction consideration. In addition, the proposal covered certain governance matters, including that Ensco's CEO be the CEO of the combined company, that the chairman of the board of the combined company would be nominated by Rowan, that the combined company board would consist of 11 directors, including six Ensco directors and five Rowan directors and that the headquarters of the combined company would be located in London or Houston.

82.    Later that day, Burke and Trowell discussed Ensco's proposal.  Trowell told Burke that, due to feedback from Ensco shareholders during the proxy solicitation with respect to the Atwood acquisition, Ensco would not agree to pay the premium that Rowan had sought in its May 29th response.

83.    On June 11, 2018, the Rowan Board met to discuss, among other items, Rowan's pursuit of a purchase of assets from Party I, and a response to Ensco's June 5th letter.  As of June 8, 2018, the last trading day before the Rowan Board meeting, the exchange ratio was approximately 2.46 based on the close of trading the previous day, having moved in Rowan's favor the last five days, making the Ensco proposal effectively an at-market offer.  The Rowan Board again reviewed the implications of the CIC Rights, the dynamics involved in Burke's continued contributions to ARO and determined that to ensure success of ARO, the combined company's CEO would need to be Burke.  The Rowan Board again expressed significant concern over the contingent liability associated with the Brazil matter and instructed executive management to continue to evaluate that exposure.

84.    Burke and Trowell had a lunch meeting in Houston on June 14, 2018, to discuss the terms of Ensco's June 5, 2018 proposal, the need for a consent from Aramco related to the CIC Rights and outstanding due diligence items.

85.    On June 16, 2018, Burke and a representative from Party B held a meeting to discuss the previously abandoned negotiations and agreed that recommencing negotiations was not warranted.

86.    On June 17, 2018, Burke met with a board member of Party J, a global provider of offshore contract drilling services with jack-ups rigs, in London, and discussed the market generally for offshore drilling services and a potential business combination.  The representative of Party J stated that he would like for Rowan and Party J to engage in a transaction.  Burke responded that he would discuss the opportunity with the Rowan Board but deemed the combination likely unattractive to Rowan's shareholders because, in Burke's opinion, Party J's relative valuation was much higher than Rowan's, its equity had significantly lower trading volumes than Rowan and Party J had a weak backlog position.  The Rowan Board ultimately agreed with Burke's assessment.

87.    On June 18, 2018, Burke and Albrecht met with Trowell and Rowsey in London to discuss the terms of a potential transaction, including the proposed exchange ratio and the strategic rationale of the transaction.  At the meeting, Albrecht noted the Rowan Board was focused on the continuity in relationships with ARO, particularly with respect with Burke's role in the combined company.  Trowell and Rowsey insisted that the transaction be effected in an at-market, no premium transaction based on the trailing 30-day average share price for Rowan ordinary shares.  Rowsey and Albrecht met separately later that day to discuss governance matters.

88.    Between June 20, 2018, and August 31, 2018, Trowell and Burke had multiple phone calls to discuss the terms of a potential transaction between Rowan and Ensco and the transaction process generally.  During this time period and through the execution of the

transaction agreement, Trowell updated Rowsey and Burke updated Albrecht, in each case, on a regular basis regarding the status of discussions, and Rowsey had multiple phone calls with individual Ensco directors to discuss the same, and Albrecht had multiple phone calls with individual Rowan directors to discuss the same.

89.     On June 29, 2018, Burke and Trowell had a telephone conversation.  Trowell reiterated to Burke the terms on which the Ensco Board would engage in a business combination transaction, including an at-market, no premium transaction based on the trailing 30-day average share price, that Ensco would appoint the initial CEO of the combined company and that Rowan would appoint the executive chairman of the combined company for a defined period of time. Burke expressed to Trowell the Rowan Board's concern with the Brazil matter.  Burke also informed Trowell that the Rowan Board was still considering Ensco's proposals and the various discussions during the preceding month and would further discuss them at a board meeting in July 2018.  Using an exchange ratio based on the close of trading the previous day, Ensco's "at market proposal" would mean that Rowan shareholders receive 2.214 Ensco ordinary shares for each Rowan ordinary share as transaction consideration.

90.     That same day, Albrecht and Rowsey had a telephone conversation.  Rowsey communicated the same terms to Albrecht that Trowell had communicated to Burke.

91.     On July 3, 2018, Burke told Trowell that, based on conversations between Burke and members of the Rowan Board, a merger on the terms proposed by Ensco seemed unlikely, but the Rowan Board would discuss the potential transaction at its meeting in London at the end of July.

92.     On July 9, 2018, Burke met representatives of Party I in London to continue their discussions of May 22, 2018.

93.     Twice in July 2018, representatives of Rowan met or communicated with officials from shipyards to discuss an acquisition of drilling assets from a financially distressed counterparty.

94.     On July 12, 2018, Burke and Butz met with a significant shareholder in Houston. At the meeting, the shareholder presented a concept for significantly restructuring Rowan's balance sheet while creating a jack-up company and drillship company, both publicly traded entities.    The Rowan Board subsequently reviewed the concept and determined that the transaction would not be in the best interest of Rowan stakeholders given the importance of scale, cost structure and credit profile, which the proposed concept would cause to deteriorate.

95.     On July 25-27, 2018, the Rowan Board met and reviewed the medium- and long-term outlook for deep-water based on a third-party analysis and compared that to Rowan's executive management's assessment.    The Rowan Board also continued its ongoing strategic assessment.    Rowan executive management advised the Rowan Board that, in management's opinion, the opportunity with Party I was considerably less attractive than a combination with Ensco.    Nevertheless, Rowan's executive management proposed that it was worth exploring this opportunity in the event a combination with Ensco could not be achieved.    The Rowan Board instructed Rowan executive management to continue its engagement with Party I.

96.     On July 27, 2018, during the Rowan Board meeting Albrecht and Rowsey had a telephone conversation to discuss various aspects of a proposed transaction.

97.     During the same Rowan Board meeting, the Rowan Board reviewed the strategic rationale of the Rowan/Ensco combination, together with the strengths and weaknesses of the proposed transaction.    The Rowan Board also considered (1) the historic exchange ratio between the two companies (and that the exchange ratio had moved in Ensco's favor since negotiations

commenced), (2) the relative EBITDA and other financial contributions from the two companies, (3) certain pro forma financials of the combined company, (4) expected benefits of the proposed transaction vis-à-vis Rowan on a standalone basis, (5) the Brazil matter and various considerations around ARO and (6) precedent merger-of-equals transactions. After discussion, and upon receiving advice from its legal and financial advisors, the Rowan Board advised Rowan executive management to continue its pursuit of the transaction and then discussed the elements of a proposed response to Ensco. Using an exchange ratio based on the close of trading the previous day, Ensco's "at market proposal" would mean that Rowan shareholders receive 2.003 Ensco ordinary shares for each Rowan ordinary share.

98.    On August 2, August 12 and August 24, 2018, representatives of Rowan and representatives of Party I had telephone calls to continue their conversation of July 9, 2018.

99.    On August 8, 2018, in a phone conversation between Burke and Albrecht, Burke noted that, using an exchange ratio based on the close of trading the previous day, Ensco's "at market proposal" would mean that Rowan shareholders would receive 1.788 Ensco ordinary shares for each Rowan ordinary share.

100.    On August 16, 2018, Ensco and its customer announced that they had settled all claims between them relating to the Brazil matter, with no payments being made. Rowan executive management considered this an important milestone that made a combination with Ensco more attractive.

101.    During an Ensco Board meeting held on August 21, 2018, Rowsey and Trowell updated the Ensco Board regarding their recent discussions with Albrecht and Burke relating to the terms of a potential transaction and proposed governance matters, including Rowan's desire that Burke be the CEO of the combined company due to his involvement in ARO and his

working relationship with Aramco. The Ensco Board determined to continue discussions with Rowan on the basis that Rowan's CEO be the CEO of the combined company provided that the transaction reflected an at-market, no premium combination, Ensco directors retained six of the 11 combined company board seats and Ensco retained the right to appoint other key executive management positions.

102. On August 24, 2018, Ensco sent a letter to Rowan reiterating its interest in a potential combination. The letter outlined Ensco's proposed terms for the potential transaction, including (1) an all-stock transaction, (2) a no premium combination resulting in a relative ownership split in the combined company of 62% for Ensco shareholders and 38% for Rowan shareholders, (3) agreement that Rowan's CEO would serve as CEO of the combined company, (4) appointment of the Chief Operating Officer, CFO and General Counsel of the combined company by Ensco, (5) appointment of Ensco's CEO as Executive Chairman of the combined company, (6) an 11 member board of directors of the combined company, comprising six Ensco directors and five Rowan directors, (7) a condition to closing that Rowan obtain any required consents by the parties to ARO required in connection with the proposed transaction, and (8) the headquarters of the combined company would be in London.

103. On August 28, 2018, on behalf of Ensco, Trowell and Rowsey delivered to Albrecht and Burke, on behalf of Rowan, an additional nonbinding letter clarifying certain governance arrangements, including how certain appointment and removal rights would work for the Executive Chairman of the combined company, the term of the Executive Chairman's tenure, and the roles and responsibilities of the Executive Chairman vis-à-vis the CEO.

104.   On August 29, 2018, Trowell contacted Burke to let him know that the SEC had informed Ensco that it was concluding its investigation related to the Brazil matter without any enforcement action.

105.   On August 31, 2018, the Rowan Board convened a meeting by telephone to review the status of the potential transaction and its strategic rationale.   The Rowan Board, among other items, reviewed the proposed exchange ratio versus historic share performance between the two companies.   The Rowan Board also reviewed additional transaction considerations, including the magnitude and likelihood of expected synergies and the strategic advantages the combined company would have due to increased scale (including the capacity to develop new technology, the benefits of a more diverse fleet and the ability to absorb the fixed costs of operations).   In light of those transaction considerations, the Rowan Board determined a combination with Ensco to be highly attractive and expressed willingness to consider an at-market exchange ratio.   However, the Rowan Board instructed Rowan executive management that Rowan would not accept any discount to the trading price of Rowan's ordinary shares immediately prior to announcement.   Rowan management also advised the Rowan Board that the SEC's investigation regarding the Brazil matter had concluded, which made an Ensco combination more attractive. Using an exchange ratio based on the close of trading the previous day, Ensco's "at market proposal" would mean that Rowan shareholders receive 2.014 Ensco ordinary shares for each Rowan ordinary share.

106.   On August 31, 2018, Rowan sent a letter to Ensco in response to Ensco's August 24, 2018 letter, as clarified by Ensco's letter from August 28, 2018, indicating Rowan's continued interest in the transaction and in proceeding to solicit Aramco's support for the proposed transaction.   In its nonbinding letter, Rowan proposed that (1) the combined company

include an independent lead director, which would be Rowan's chairman of the board initially, (2) Burke would waive the accelerated vesting of an equity retention grant awarded in February 2017 and severance rights, both triggered by the move of his employment to London in connection with the proposed transaction, (3) the Executive Chairman of the combined company would serve for a term of 18 months following the closing, and (4) supermajority voting requirements for the combined company's board and any agreed governance requirements of the combined company would be set forth in revised articles of association of the combined company.

107.    The following day, Burke and Trowell had a telephone conversation regarding Rowan's response and concluded that the governance arrangements were the most significant issues remaining.

108.    On September 4, 2018, Ensco publicly announced that the SEC had concluded its investigation and that the U.S. Department of Justice had stated that it had closed its inquiry into the Brazil matter.

109.    At an industry conference on September 4, 2018, members of Rowan executive management made an investor presentation that included further disclosures regarding ARO. Later that day, Burke and Trowell met to discuss the potential combination and had a follow-up telephone conversation on September 6, 2018. Following the conversation, they had agreed a framework for determining the combined company's management team and generally resolved issues with respect to the roles and responsibilities of the Executive Chairman and CEO of the combined company. Additionally, they discussed the strategy for obtaining Aramco's waiver of the CIC Rights.

110.    Lowe met with Burke in Houston on September 8, 2018, to discuss ARO and the impact of a potential transaction on the operations of ARO.  At the meeting, Lowe and Burke discussed the need to obtain a waiver from ARO related to the CIC Rights.

111.    On September 10, 2018, Rowsey and Gaut met with Albrecht and Hix in Houston to discuss the proposed transaction, including the governance structure, executive management positions, and CEO and executive chairman compensation matters (including a requirement that Burke waive additional rights to the acceleration of his time-based unvested restricted stock awards in order to align his interests with the shareholders of the combined company).

112.    On the evening of September 10, 2018, Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), Ensco's U.S. legal advisor, sent Kirkland & Ellis LLP ("Kirkland"), Rowan's legal advisor, a draft of the transaction agreement that proposed governance and deal protection provisions.

113.    On September 10, 2018, representatives from Rowan, Kirkland, Ensco, and Gibson Dunn met in Houston.  During the meeting, the parties exchanged certain due diligence information with each other and discussed the strategic importance of ARO and its support. Throughout the month of September until the parties executed the transaction agreement, the parties and their respective legal counsel either met or participated in telephone conference calls with respect to due diligence matters.

114.    On September 13, 18 and 20, 2018, Burke met with representatives of Aramco to discuss the combination of Ensco and Rowan and Aramco's waiver of the CIC Rights.  Burke stated to the Aramco representatives the combined company's commitment to the future success of ARO, as well as of his continued leadership.  On September 17, 2018, Rowan sent a formal

waiver request to Aramco.  On September 18, 2018, Trowell met with representatives of Aramco to discuss the combination of Ensco and Rowan.

115.    Between September 13 and September 18, Burke and Trowell met in Saudi Arabia and had several calls to discuss the possible combination and matters related to ARO.

116.    On September 15, 2018, Kirkland sent Gibson Dunn a revised draft of the transaction agreement, countering with other governance and deal protection provisions.

117.    On September 17, 2018, Slaughter and May ("Slaughter"), Ensco's UK legal advisor, delivered the initial draft of the Scheme of Arrangement to Kirkland.

118.    On September 18, 2018, Kirkland sent Gibson Dunn a draft of the Ensco Rowan Corporate Governance Policy, which would take effect upon the closing of the proposed transaction, and Kirkland subsequently sent Gibson Dunn a further revised draft of the Ensco Rowan Corporate Governance Policy on September 25, 2018.

119.    On September 20, 2018, Gibson Dunn delivered to Kirkland a revised draft of the transaction agreement.  Between September 20, 2018, and October 7, 2018, Gibson Dunn and Slaughter, on behalf of Ensco, and Kirkland, on behalf of Rowan, engaged in a number of conversations regarding, and exchanged drafts of, the documents for the potential transaction, including, among others, the transaction agreement and each party's disclosure schedules thereto, the Scheme of Arrangement and the Ensco Rowan Corporate Governance Policy.

120.    Between September 23, 2018, and October 4, 2018, Burke and Trowell had a series of telephone conversations regarding various aspects of the potential combination, including management positions, governance considerations and duties of executives.

121.    On September 24, 2018, Rowan held a meeting of the Rowan Board.  During the meeting, representatives of Rowan executive management and Goldman Sachs provided the

Rowan Board with an overview of financial due diligence conducted to date, and representatives of Rowan management and Kirkland provided the Rowan Board with an overview of legal due diligence conducted to date.  The Rowan Board asked questions with respect to the due diligence findings and made additional requests for further due diligence with respect to certain matters. Representatives of Kirkland then provided a summary of the then-current draft of the transaction agreement and the remaining material issues and answered the Rowan Board's questions with respect thereto.  Following these presentations, the Rowan Board discussed the benefits and detriments of the transaction.  Among other things, the Rowan Board discussed the magnitude and likelihood of expected synergies and operational benefits the combined company would achieve and further discussed the importance the CIC Rights waiver to achieve such expectations.  Finally, the Rowan Board discussed the open issues and instructed executive management of Rowan, Kirkland and Goldman Sachs to attempt to resolve the remaining open issues.

122.    Additionally, at the same meeting, Burke agreed to Ensco's requirement that he waive his rights to acceleration of his time-based unvested restricted stock awards in order to align his interests with the shareholders of the combined company and reduce the transaction costs.

123.    On October 4, 2018, Mukamala Oil Field Services Limited, a subsidiary of Saudi Aramco Development Company and holder of 50% of the interests of ARO, delivered a letter that, among other things, waived its option, arising in connection with the proposed transaction, to purchase Rowan's interest in ARO and consented to the completion of the transaction.

124.    That same day, Burke and Trowell met in London to discuss the material outstanding issues, including the governance arrangements for the combined company.

125.    Between October 4, 2018, and October 6, 2018, Rowsey and Albrecht engaged in conversations regarding the terms of the proposed transaction, including the governance of the combined company following the closing.

126.    On October 5, 2018, Burke and Trowell met in London again to discuss material outstanding issues, including the exchange ratio and the governance arrangements.  After the close of trading on the NYSE, Burke and Trowell had a telephone call to discuss the exchange ratio to use in the transaction.  Burke proposed that the exchange ratio should be based on the closing price at the end of trading that day and, therefore, should be 2.215.  Trowell stated that he would discuss the matter with the Ensco Board.

127.    The same day, Ensco retained Citigroup Global Markets Inc. and HSBC Securities (USA) Inc. as co-financial advisors to Ensco in connection with the potential transaction with Rowan.

128.    On October 6, 2018, following an Ensco Board meeting, Trowell informed Burke that the Ensco Board approved the proposed terms of the transaction and the exchange ratio of 2.215, based on the market price at the close of trading on October 5, 2018.  Also, on October 6, 2018, Rowan and Ensco finalized the remaining outstanding issues, including setting expense reimbursement if a party's shareholders did not approve the transaction at $15 million instead of $10 million and establishing a threshold for remedial actions related to antitrust matters at $400 million.

129.    On October 6, 2018, Rowan held a meeting of the Rowan Board in London. Members of Rowan's executive management, together with representatives from Kirkland, Goldman Sachs and Rowan's compensation consultants, participated in the meeting in person and by telephone conference.  At the meeting, representatives of Kirkland provided to the Rowan

Board an update regarding the terms of the transaction, including the terms of the transaction agreement, the governance policy and the employment agreements of Burke and Trowell to be entered into in connection with the transaction.  The Rowan Board discussed that the parties had agreed to an exchange ratio of 2.215 Ensco ordinary shares for each Rowan ordinary share. Also, at the meeting, Goldman Sachs reviewed with the Rowan Board its financial analyses of the exchange ratio provided for in the transaction and delivered to the Rowan Board an oral opinion, confirmed by delivery of a written opinion dated October 7, 2018, to the effect that, as of such date and based upon and subject to the factors and assumptions stated in such opinion, the exchange ratio pursuant to the transaction agreement was fair, from a financial point of view, to the holders (other than Ensco and its affiliates) of the Rowan ordinary shares.  The Rowan Board then (i) unanimously determined that the transaction and the scheme of arrangement were in the best interests of Rowan and the Rowan shareholders, and declared it advisable to enter into the transaction agreement, (ii) approved the execution, delivery and performance of the transaction agreement and the consummation of the transactions contemplated thereby, including the transaction and the scheme of arrangement, and (iii) resolved to recommend the adoption of the transaction agreement and the passing of the Rowan shareholder resolutions by the Rowan shareholders.

130.    That night and the following day, Kirkland and Gibson Dunn finalized the transaction agreement and the ancillary documents.

131.    Ensco and Rowan then executed the transaction agreement on October 7, 2018. In connection with the execution of the transaction agreement and with respect to their employment upon the consummation of the transaction, Burke entered into an employment agreement with Rowan Companies, Inc., ENSCO Global Resources Limited and, solely for the

purposes of guaranteeing the payments and obligations under his employment agreement, Ensco and Trowell entered into a new employment agreement with Ensco.

132. Also on October 7, 2018, Trowell met with Burke in Houston to discuss the announcement of the transaction and communications to investors regarding the proposed transaction.

133. Prior to the opening of markets in the United States on October 8, 2018, Ensco and Rowan jointly announced the transaction and held a joint investor conference call. According to the press release announcing the Proposed Transaction:

> LONDON, Oct. 8, 2018 /PRNewswire/ -- Ensco plc (NYSE: ESV) and Rowan Companies plc (NYSE: RDC) jointly announced today that the companies have entered into a definitive transaction agreement under which Rowan will combine with Ensco in an all-stock transaction. The definitive transaction agreement was unanimously approved by each company's board of directors. The Saudi Aramco partner to the ARO Drilling joint venture has consented to the combination between Rowan and Ensco.
>
> Under the terms of the transaction agreement, Rowan shareholders will receive 2.215 Ensco shares for each Rowan share. Upon closing, Ensco and Rowan shareholders will own approximately 60.5% and 39.5%, respectively, of the outstanding shares of the combined entity. There are no financing conditions for this transaction.
>
> The combined company expects to realize annual pre-tax expense synergies of approximately $150 million, with more than 75% of targeted synergies expected to be realized within one year of closing. As a result, the transaction is projected to be accretive to cash flow per share in 2020 following an anticipated closing in the first half of 2019.
>
> Rowan President and Chief Executive Officer Tom Burke, who will serve as President and Chief Executive Officer of the combined company, said, "We are excited to reach an agreement to combine our well-respected organizations, enabling both Rowan and Ensco shareholders to participate in the substantial value creation opportunities of a larger, more technologically-advanced and diverse offshore drilling company. By merging our high-quality rig fleets and infrastructure covering the world's most prolific offshore basins, we increase our scale while maintaining a shared focus on high-specification assets that will include ultra-deepwater drillships and versatile semisubmersibles, as well as harsh environment

and modern jack-ups. Rowan shareholders also benefit from the addition of significant backlog and substantial scale in ultra-deepwater operations. The combined entity's talented workforce, unrivaled geographic and customer diversification, and solid financial position ideally position us to meet increasing customer demand for the most technologically-advanced drilling rigs as the offshore sector recovers."

Ensco President and Chief Executive Officer Carl Trowell, who will serve as Executive Chairman of the combined company, stated, "The combination of Ensco and Rowan will create an industry leader in offshore drilling across all water depths, with significant advantages to capitalize on future opportunities and better serve our customers. Ensco and Rowan share a common culture built around safety and operational excellence, innovation, technical expertise and customer satisfaction. Through this combination, Ensco shareholders will uniquely benefit from Rowan's strategic joint venture with Saudi Aramco, ARO Drilling, while all stakeholders will share in meaningful cost savings and even greater upside to improving market conditions as the industry recovery continues gaining momentum."

**Combined Company Highlights and Strategic Fit**

*Creating a leading offshore rig fleet, with many of the industry's highest specification assets*

▪ The combination will bring together both companies' complementary businesses, creating a leading offshore driller by fleet size, geographic presence and customer base, with 82 rigs[1] spanning six continents and collectively serving more than 35 customers, including the largest national oil companies, international majors and independent exploration and production companies.

▪ The combined company's rig fleet of 28 floaters and 54 jack-ups will be among the most technologically-advanced in the industry, capable of providing a wide range of drilling services to an expanded base of clients around the world, and will be ideally positioned to meet increasing levels of customer demand for the highest-specification ultra-deepwater drillships and harsh environment jack-ups.

▪ Within the fleet of 28 floating rigs (drillships and semisubmersibles) are 25 ultra-deepwater rigs capable of drilling in water depths of greater than 7,500 feet, with an average age of six years – establishing this fleet among the youngest and most capable in the industry. The combined fleet will also have the second-largest fleet of the highest-specification drillships[2] in the industry, with 11 of these seventh generation ultra-deepwater rigs.

▪ The 54-rig jack-up fleet will include 38 units that are equipped with many of the advanced features requested by clients with shallow-water drilling programs, such as increased leg length, expanded cantilever reach and greater hoisting capacity. Among the combined company's jack-up fleet are seven ultra-harsh environment units and nine additional modern harsh environment rigs.

*Unparalleled geographic coverage*

▪ The combined company will be the most geographically-diverse offshore driller with current operations and drilling contracts spanning six continents in nearly every major deep- and shallow-water basin around the world including the Gulf of Mexico, Brazil, West Africa, North Sea, Mediterranean, Middle East, Southeast Asia and Australia.

▪ Ensco shareholders will gain exposure to the ARO Drilling joint venture and ultra-harsh environment jack-ups, along with a presence in Norway. Rowan shareholders gain access to Ensco's strong relationships with large deepwater customers and wider geographic footprint, which includes a presence in Brazil, West Africa, Southeast Asia and Australia, along with a versatile semisubmersible fleet.

*Servicing the broadest customer base, with continued emphasis on customer satisfaction*

▪ Customers of the combined company will include most of the leading national and international oil companies, plus many independent operators. Customers will benefit from enhanced diversification of high-quality assets that best meet their drilling requirements.

▪ Both companies have long track records of being recognized as leaders in customer satisfaction, including eight consecutive years ranked #1 in total satisfaction and seven years ranked #1 for high pressure, high temperature application among offshore drillers by EnergyPoint Research. The combined company will continue its commitment of delivering industry-leading service.

*Technology focus to differentiate services and lower costs*

▪ The combined company is dedicated to deploying new technologies and innovative solutions that differentiate its services and drive operational integrity and performance at the well site. With a larger, more diversified fleet, the combined company can economically develop and deploy these advancements across a wider asset base and global footprint.

The combined company is expected to leverage ARO Drilling's 20-rig new build program to develop and deploy leading-edge technology at scale.

**Financial Highlights**

The combined entity is expected to generate future revenue growth opportunities as it capitalizes on an expanded, high-quality fleet serving a larger customer base across a wider geographic footprint. Estimated annual expense savings of $150 million are expected to be realized primarily from corporate and regional overlaps, supply chain efficiencies as well as the standardization of systems, policies and procedures across the combined organization. Based on these anticipated annual savings, the planned combination is expected to be accretive to cash flow per share annually for the combined entity beginning in 2020.

The combined company's balance sheet is expected to have liquidity of approximately $3.9 billion, including $1.9 billion of cash and short-term investments[3], providing the new entity with the financial flexibility to continue investing in the fleet and innovations aimed at improving drilling efficiencies. The combined company's credit profile will benefit from increased scale and significantly enhanced diversification across regions, rig types, customers and expertise due to the diverse makeup of its respective businesses. The total estimated revenue backlog for the combined company is approximately $2.7 billion[3], excluding ARO Drilling's substantial backlog which is unconsolidated. Based on the closing price of each company's shares on 5 October 2018, the estimated enterprise value of the combined company is $12.0 billion.

**Governance**

Carl Trowell will become the combined company's Executive Chairman, Tom Burke will serve as President and Chief Executive Officer, and Jon Baksht will serve as Senior Vice President and Chief Financial Officer. The remaining executive management team for the combined company will be named at a later date and will comprise executives from both Ensco and Rowan. Effective upon closing, the combined company's board of directors will include Carl Trowell and Tom Burke, plus five additional members from Ensco's current board and four additional members from Rowan's current board.

The combined company will be domiciled in the United Kingdom, where both Ensco and Rowan are currently domiciled, and senior executive officers will be located in London and Houston.

**Conditions and Timing**

The transaction is subject to approval by the shareholders of Ensco and Rowan and regulatory authorities, as well as other customary closing conditions. In addition, the transaction will be subject to court approval pursuant to a UK court-sanctioned scheme of arrangement. The

transaction is not subject to any financing conditions. Ensco and Rowan intend to file a joint proxy statement with the Securities and Exchange Commission as soon as possible. The companies anticipate that the transaction will close during the first half of 2019.

**Advisors**

Morgan Stanley & Co. LLC is lead financial advisor to Ensco. HSBC Securities (USA) Inc. and Citigroup Global Markets Inc. also provided financial advice to Ensco. Ensco's legal advisors are Gibson, Dunn & Crutcher LLP and Slaughter and May. The financial advisor for Rowan is Goldman Sachs & Co. LLC and its legal advisors are Kirkland & Ellis LLP and Latham & Watkins LLP.

**Insiders' Interests in the Proposed Transaction**

134.    Rowan insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Rowan.

135.    Company insiders stand to reap a substantial financial windfall for securing the deal with Ensco. Change in control agreements provide that unvested equity awards will, upon a "change in control" generally become immediately fully vested and where applicable, exercisable, all restrictions and conditions thereon will be deemed satisfied in full, and all limitations will be deemed expired unless otherwise provided in the applicable award documents. The change in control agreements further provide that any vested share options or share appreciation rights will be exercisable until the earlier of (i) the second anniversary of the Scheme Effective Time or (ii) the original maximum term of the share option or share appreciation right, as applicable.

136.    While Burke waived equity award acceleration, he negotiated the "Burke Employment Agreement," pursuant to which he will receive a significant salary increase and

other unique benefits including, *inter alia*, a one-time, lump-sum cash payment of $3,750,000 as a sign-on bonus, and other increased bonuses.

137.    The Proxy Statement shows the following quantification of potential payments and benefits to Rowan's named executive officers in connection with the transaction:

| Name | Cash(1) | Equity(2) | Other(3) | Total |
|------|---------|-----------|----------|-------|
| Thomas P. Burke | $ 6,985,105 | $ 18,695,999 | $ 64,282 | $ 25,745,385 |
| Stephen M. Butz | $ 2,060,665 | $ 6,866,919 | $ 51,188 | $ 8,978,773 |
| T. Fred Brooks | $ 1,753,669 | $ 3,888,405 | $ 43,519 | $ 5,685,593 |
| Mark F. Mai | $ 1,608,297 | $ 2,519,377 | $ 51,188 | $ 4,178,862 |
| Mark A. Keller(4) | $ — | $ 1,484,452 | $ — | $ 1,484,452 |

**The Proxy Statement Omits Material Information, Rendering It Materially False and Misleading**

138.    Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.  As set forth herein, the Proxy Statement omits material information with respect to the Proposed Transaction.

*Material Omissions Relating to Goldman Sachs' Conflicts*

139.    The Proxy Statement says both "[o]n May 2, 2018, Goldman Sachs delivered an executed disclosure letter regarding certain of its relationships with Ensco to Rowan" and that "During the two-year period ended October 7, 2018, the Investment Banking Division of Goldman Sachs has not been engaged by Ensco or its affiliates to provide financial advisory or underwriting services for which Goldman Sachs has recognized compensation."

140.    It is thus unclear what the scope of Goldman Sachs' relationships with Ensco are, or why it felt it had to disclose certain relationships in the executed disclosure letter.

141.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration,

selection, and implementation of strategic alternatives.  That is especially true where, here, Goldman acted as the only financial advisor to Rowan.

**Material Omissions Relating to Background Information**

142.    According to the Proxy Statement, Rowan entered into confidentiality agreements with Party B and Party G.  However, the Proxy Statement does not describe the terms of the confidentiality agreements, including whether such agreements included a "don't-ask, don't waive" provision, standstill provision or other impediments to a market check.  The Proxy Statement further omits a description of the circumstances under which any such provisions would fall away, if such agreements are included.  This information is material to a reasonable stockholder seeking to evaluate the Proposed Transaction, including the Board's decision-making concerning the sale process (or absence thereof).

143.    Finally, the Proxy Statement makes one passing reference to "Rowan's compensation consultants" having participating in an October 6, 2018, Rowan Board meeting.  There is no discussion of, *inter alia*, who Rowan's compensation consultants are, why they participated in the meeting, how they participated, what conflicts they might have, or any other information that would be necessary for shareholders to understand this reference.

*Material Omissions Relating to Goldman Sachs' Analyses*

144.    The Proxy Statement omits material information regarding the Company's financial projections, as well as the valuation analyses performed by Goldman Sachs in connection with the Proposed Transaction.

> *Material Omissions in Illustrative Discounted Cash Flow Analysis—Rowan Standalone*

145.    The Proxy Statement's disclosure of Rowan's unlevered discounted cash flow analysis presented by Goldman is materially incomplete and misleading because it fails to

disclose all information necessary for a reasonable stockholder to understand the import of such analysis, including (i) the basis for Goldman's selection of a discount rate range (9.50% to 10.50%) reflecting estimates of Rowan's weighted average cost of capital and company-specific CAPM inputs (especially as compared to Morgan Stanley's use of discount rates ranging from 8.2% to 10.5%, excluding ARO, for the period between July 1, 2018, through December 31, 2025, based on Morgan Stanley's estimate of Rowan's weighted average cost of capital under different scenarios), and (ii) the basis for Goldman's selection of terminal value to EBITDA multiple range of 5.5x to 7.5x to estimated terminal year EBITDA for Rowan (especially as compared to Morgan Stanley's use of a terminal value range for of Rowan (excluding ARO) of 5.0x to 8.0x for the twelve months ending June 30, 2029). The sensitivity of a discounted cash flow analysis to these inputs and metrics makes the omitted information particularly material to a stockholder asked to evaluate the Proposed Transaction.

*Material Omissions in Illustrative Discounted Cash Flow Analysis—Ensco Standalone*

146.  The Proxy Statement's disclosure of Ensco's unlevered discounted cash flow analysis presented by Goldman is materially incomplete and misleading because it fails to disclose all information necessary for a reasonable stockholder to understand the import of such analysis, including (i) the basis for Goldman's selection of a discount rate range (10.00% to 11.00%) reflecting estimates of Ensco's weighted average cost of capital and company-specific CAPM inputs (especially as compared to Morgan Stanley's use of discount rates ranging from 8.7% to 10.3%, based on Morgan Stanley's estimate of Ensco's weighted average cost of capital under different scenarios), and (ii) the basis for Goldman's selection of terminal value to EBITDA multiple range of 5.5x to 7.5x to estimated terminal year EBITDA for Rowan (by applying a multiple of aggregate value to estimated EBITDA for the twelve months ending

June 30, 2029, of 5.0x to 8.0x).  The sensitivity of a discounted cash flow analysis to these inputs and metrics makes the omitted information particularly material to a stockholder asked to evaluate the Proposed Transaction.

<em>Material Omissions in Illustrative Discounted Cash Flow Analysis—Ensco Standalone</em>

147.    The Proxy Statement's disclosure of the pro forma combined company's unlevered discounted cash flow analysis presented by Goldman is materially incomplete and misleading because it fails to disclose all information necessary for a reasonable stockholder to understand the import of such analysis, including (i) the basis for Goldman's selection of a discount rate range (9.75% to 10.75%) reflecting estimates of Ensco's weighted average cost of capital and company-specific CAPM inputs (especially as compared to Morgan Stanley's use of a discount rate of 9.7% for the period between July 1, 2018, through December 31, 2025, based on Morgan Stanley's estimate of the pro forma WACC range resulting from a combination of Ensco and Rowan for such period, and a discount rate of 9.4% for the period thereafter based on Morgan Stanley's estimate of the pro forma WACC range resulting from a combination of Ensco and Rowan for such period), and (ii) the basis for Goldman's selection of terminal value to EBITDA multiple range of 5.5x to 7.5x to estimated terminal year EBITDA for the pro forma combined company.  The sensitivity of a discounted cash flow analysis to these inputs and metrics makes the omitted information particularly material to a stockholder asked to evaluate the Proposed Transaction.

<em>Material Omissions Regarding Analyst Estimates</em>

148.    The Proxy Statement also states that Goldman Sachs reviewed "certain publicly available research analyst reports for Rowan and Ensco" but fails to disclose which public equity research analysts were reviewed and each of their specific price targets.

39

*Omissions Regarding Any Other Analyses Done by Goldman's*

149.    If Goldman performed any other analyses, including analogs of the several analyses that Morgan Stanley performed for Ensco but that the Proxy Statement does not show Goldman Sachs performed for Rowan, those analyses must also be fully disclosed.

\*        \*        \*

150.    The omission of the above-referenced material information renders the Proxy Statement material false and misleading, including, inter alia, the following sections of the Proxy Statement: (i) Background of the Transaction and (ii) Opinion of Financial Advisor to Rowan.

151.    The omitted information, if disclosed, would significantly alter the total mix of information available to the Company's ordinary shareholders.

## **COUNT I**

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Rowan**

152.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

153.    The Individual Defendants disseminated the materially false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Rowan is liable as the issuer of these statements.

154.    The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

155.    The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

156.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable ordinary shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

157.    The Proxy Statement is an essential link in causing Plaintiff and the Company's ordinary shareholders to approve the Proposed Transaction.

158.    By reason of the foregoing, Defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

159.    Because of the materially false and misleading statements in the Proxy Statement, Plaintiff and the other members of the Class are threatened with irreparable harm and have no adequate remedy at law.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

160.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

161.    The Individual Defendants acted as controlling persons of Rowan within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Rowan and participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false statements and omissions contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that plaintiff contends are materially false and misleading and omissions.

162.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

163.    In particular, each of the Individual Defendants had direct and supervisory involvement of the operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Proxy Statement.

164.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

165.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff and the other members of the Class are threatened with irreparable harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, certifying the Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction unless and until Defendants disseminate a version of the proxy statement that is not materially false and misleading and does not omit material facts;

C.    In the event that Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D.    Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.    Declaring that Defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder; and

F.    Awarding the Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.    Granting such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  November 12, 2018.

Respectfully submitted,

_____*/s/ Thomas E. Bilek*_____

Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**

700 Louisiana, Suite 3950
Houston, TX 77002
(713) 227-7720

*Attorneys for Plaintiff*

**OF COUNSEL:**

Aaron L. Brody (*Pro Hac Vice* motion forthcoming)
Michael J. Klein (*Pro Hac Vice* motion forthcoming)
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Tel:      (212) 687-7230
Fax:      (212) 490-2022
Email:   abrody@ssbny.com
          mklein@ssbny.com